**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION and Marion Shaub, Plaintiff/Intervenor**

v.

**FEDERAL EXPRESS CORPORATION, Defendant.**

**Civil Action No. 1:02–CV–1194.**

United States District Court, M.D. Pennsylvania.

Jan. 18, 2005.

702

Cynthia A. Locke, David Ingram, Equal Employment Opportunity Commission, Philadelphia, PA, Martha Sperling, Silver and Sperling, Doylestown, PA, Ralph E. Lamar, IV, Ralph E. Lamar, IV, Esq., Collegeville, PA, for Plaintiff/Intervenor.

Alexandra Makosky, Pepper, Hamilton LLP, Harrisburg, PA, Frederick L. Douglas, Jeana M. Littrell, Federal Express Corporation, Memphis, TN, Sean P. McDevitt, Pepper Hamilton LLP, Berwyn, PA, for Defendant.

### AMENDED MEMORANDUM AND ORDER

YVETTE KANE, District Judge.

Before the Court are the following post-trial motions filed in the above-captioned case: (1) Defendant's renewed motion for judgment as a matter of law (Doc. No. 257); (2) Defendant's motion to alter or amend judgment (Doc. No. 249); (3) Intervenor's motion to amend judgment to include prejudgment interest (Doc. No. 266); (4) Intervenor's motion to amend judgment to account for negative tax consequences (Doc. No. 264); (5) Intervenor's motion to amend judgment (Doc. No. 303); and (6) Intervenor's petition for attorneys' fees and costs (Doc. Nos. 260 and 271). Each motion will be addressed in turn.

## I. Background

On February 25, 2002, the Equal Employment Opportunity Commission ("EEOC") brought suit against Defendant on behalf of Marion Shaub in the United States District Court for the Eastern District of Pennsylvania, alleging employment discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). On March 7, 2002, Ms. Shaub ("Intervenor") moved to intervene in the action, which request was granted on April 5, 2002. On that same day, Intervenor filed an intervening complaint against Defendant, alleging employment discrimination on the basis of sex in violation Title VII, the Pennsylvania Human Relations Act, 43 Pa.S. § 951 *et seq.* ("PHRA"), and the common law of the Commonwealth of Pennsylvania, together with a claim of intentional infliction of emotional distress. Subsequently, pursuant to an Order dated June 6, 2002, the case was transferred to this Court.

Intervenor's claims were tried to a jury in a trial commencing on February 9, 2004. On February 24, 2004, the jury returned a verdict for Intervenor finding that although Intervenor was not subjected to unlawful discrimination on the basis of sex, Defendant was liable to Intervenor for a hostile working environment and was also liable to Intervenor for retaliation, all in violation of Title VII. In addition, the jury found that Defendant was liable to Intervenor for intentional infliction of severe emotional distress ("IIED").

The jury found that Intervenor was entitled to receive back pay damages in the amount of $101,400 and front pay damages

in the amount of $290,000 for the Title VII violations. The jury further awarded Intervenor $350,000 in compensation for emotional pain and distress, apportioned 60% for the Title VII violations and 40% for the IIED claim. Finally, the jury awarded Intervenor punitive damages in the amount of $2.5 million, apportioned 50% to the Title VII claim and 50% to the IIED claim.

## II. *Discussion*

### A. Defendant's Renewed Motion for Judgment as a Matter of Law (Doc. No. 257)

Defendant argues that contrary to the jury verdict, judgment should be entered in its favor because (1) the jury's decision was based on irrelevant and unfairly prejudicial testimony of a former employee, Lorraine Metz; (2) Intervenor failed to present evidence demonstrating that she was subjected to a hostile work environment because of her gender; (3) Intervenor failed to establish a prima facie case of retaliation; (4) Intervenor's IIED claim is statutorily barred under the Pennsylvania Workers' Compensation Act and because Intervenor failed to establish that Defendant's conduct was extreme or outrageous; and (5) the punitive damage award should be set aside because the evidence did not demonstrate that Defendant acted with malice or reckless indifference.

■■■ A motion for judgment as a matter of law should be granted only if, "viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993). "The question is not whether there

is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir.1978)). The Third Circuit has held that denial of a motion for judgment as a matter of law will be upheld where, viewing the evidence in the light most favorable to the nonmoving party, there is a "minimum quantum of evidence" from which a jury could reach a verdict for that party. *Keith v. Truck Stops Corp.*, 909 F.2d 743, 745 (3d Cir. 1990) (citations omitted). Judgment as a matter of law should be granted sparingly, although a "scintilla of evidence" is insufficient to sustain a verdict of liability. *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 205 (3d Cir.2002) (citation omitted). The Court will address in *seriatim* Defendant's five arguments in support of its motion.

### i. Testimony of Lorraine Metz Was Relevant and Not Unfairly Prejudicial

■■■ Defendant first contends that "the jury's decision was based on irrelevant and unfairly prejudicial evidence from a former employee, Cynthia Metz." [1] (Doc. No. 258, at 5.) Defendant's argument in this regard is conclusory and unsupported by legal authority. Moreover, Defendant's challenge to the relevance of Ms. Metz' testimony to Intervenor's claims rings hollow. In a recitation of her own experience of a hostile work environment and intentional discrimination at Federal Express, Ms. Metz testified that, like Intervenor, she was the only female Ramp Transport Driver at her facility. Like Intervenor, she was supervised by Robert Flynn. Like

---

1. The Court believes Defendant is referring to Lorraine Metz, a former employee of Defendant who testified during trial regarding her own experience of employment sexual harassment while working as a tractor trailer driver for Defendant in eastern Pennsylvania.

Intervenor, she endured constant and unrelenting verbal abuse. Like Intervenor, she complained. Like Intervenor, following her complaints the abuse escalated and the brake lines on her tractor trailer were sabotaged. Like Intervenor, Ms. Metz received inadequate managerial responses to her claims of discrimination and sabotage. Like Intervenor, Ms. Metz was "driven out" of Federal Express. The testimony of Ms. Metz was linked to evidence that three members of Defendant's management who were aware of Ms. Metz's allegations of harassment were involved with the investigation of Intervenor's claims of sexual harassment. Accordingly, Ms. Metz's testimony was highly relevant to establish that Defendant was on notice regarding conditions of significant sexual harassment present in the workplace. Her testimony bears on the issue of Federal Express' liability for sex discrimination and on Intervenor's claim for punitive damages.

Defendant further complains that even if Ms. Metz's testimony was relevant to establish notice, the testimony was nevertheless unfairly prejudicial to Defendant and that "but for" this testimony, Defendant "would not have been unfairly prejudiced." (Doc. No. 258, at 6.) Again, Defendant's contention is conclusory and not supported by any legal authority. Under Rule 403 of the Federal Rules of Evidence, the balance of whether to admit relevant information should be struck in favor of admissibility. *Spain v. Gallegos*, 26 F.3d 439, 453 (3d Cir.1994). Moreover, the Court is charged with weighing the probative value of evidence against the danger of *unfair* prejudice. Here, where Intervenor presents a virtual carbon copy of discrimination she endured, the questioned evidence is most relevant. The prejudice to Defendant is real, but not unfair in light of the unusually high probative value of the evidence.

Finally, Defendant seems to suggest, speculatively, that the verdict in favor of Intervenor is based entirely on the Lorraine Metz testimony. Nothing could be further from the fact. Intervenor's testimony alone supports the jury's verdict, and that testimony was bolstered by numerous witnesses who supported her claim. Substantial testimony was taken during the trial in support of the jury's verdict as to each claim. Accordingly, the Court will deny Defendant's motion for judgment as a matter of law on the basis of the testimony of Ms. Metz.

### ii. Evidence Supported the Jury's Finding that Intervenor Was Subject to a Hostile Work Environment Based on Sex

■ As Defendant correctly notes, sexual harassment·is actionable under Title VII and the PHRA if sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, permeated with discriminatory intimidation, ridicule, and insult. *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1297 (3d Cir.1997); *Bishop v. Nat'l R.R. Passenger Corp.*, 66 F.Supp.2d 650, 663–64 (E.D.Pa.1999). In order to prove a case of co-worker sexual harassment and the existence of a hostile work environment, a plaintiff must prove: (1) she suffered intentional discrimination because of her· sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable woman in the same position; and (5) the existence of respondeat superior liability. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990).

■ Defendant contends that Intervenor "did not suffer intentional discrimina-

tion because of her sex." (Doc. No. 258, at 7.) Defendant also claims that Intervenor failed to prove that the discrimination was pervasive and regular, concluding that Intervenor's testimony indicated the "statements and actions" to which Intervenor was subjected were "sporadic and made over a four-year period" and the workplace was not, therefore, sufficiently hostile to support Intervenor's claims. (*Id.,* at 8.) Defendant also argued that there was "no detrimental affect [sic]" resulting from the hostile work environment. (*Id.*) Apparently in support of this contention, Defendant notes that Intervenor "was not subject to any offensive touching or sexual demands." (*Id.*) Defendant further asserts that a "substantial" number of the offensive comments complained of "were not related to sex." (*Id.*) Additionally, Defendant claims that Intervenor did not suffer any "tangible" employment action. (*Id.*) Finally, Defendant interprets Intervenor's complaint as merely "one of disagreement experienced between employees while in the workplace." (*Id.*)

Defendant's arguments mock the severe and invidious discrimination to which Intervenor attested. Intervenor established that her co-worker Steve Crumbling, regularly used sexually crude, vile, and offensive language in front of her and that Crumbling grabbed his genitals in front of Intervenor, as did another male employee. Witnesses testified that Mr. Crumbling referred to Intervenor in vulgar and sexually offensive and derogatory terms. Evidence was presented that Mr. Crumbling told Intervenor that she looked like a porn star, spoke in Intervenor's presence about having sexual relations with his wife, and talked about potentially having sex with Intervenor. Further testimony indicated that Mr. Crumbling used similarly vulgar and offensive language to describe females generally, and made other comments about women and their sex lives in front of Intervenor and other employees.

Intervenor also presented testimony that she and other employees reported Mr. Crumbling's behavior to Defendant's management. Lorraine Metz testified that she had reported sexually offensive and derogatory language used by male drivers, and also testified that she reported that she suspected her brakes were being sabotaged by her male co-workers. There was also testimony from a male employee, David Staiger, who reported to management regarding Mr. Crumbling's treatment of Intervenor. There was further testimony that Defendant's management took limited action in response to these reports.

Moreover, Intervenor testified that after complaining to management, her brakes were tampered with, and that her reports of such tampering were insufficiently acted upon by management. On the basis of this evidence, the jury had a reasonable basis for finding that Intervenor was subjected to a hostile working environment on the basis of her sex. Accordingly, the Court will deny Defendant's motion for judgment as a matter of law on this ground.

### iii. Intervenor Presented Evidence Supporting Her Claim of Retaliation

In order to maintain a prima facie case of retaliation under Title VII, a plaintiff must prove: (1) she engaged in protected activity; (2) the employer subsequently took adverse action against her; and (3) a causal link exists between the protected activity and the employer's adverse action. *Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194, 201 (3d Cir.1994), cert. *denied,* 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). In this case, Defendant argues that Intervenor cannot succeed on her retaliation claim because she

failed to present evidence that she was subject to any adverse employment action.[2]

In response, Intervenor argues that she was subjected to adverse employment action in three ways. First, Intervenor claims that she suffered a materially adverse change in the terms and conditions of her employment because Defendant knew about, but failed to take action to abate, retaliatory harassment inflicted by Intervenor's co-workers. (Doc. No. 280, at 9.) Second, Intervenor argues that she suffered adverse employment action because Defendant removed Intervenor from her driving route and her wages were downgraded $2 per hour and, after her route was reassigned to a male driver, she was no longer permitted to drive a delivery truck. (*Id.*, at 11–12.) Finally, Intervenor asserts the evidence demonstrated that she was constructively discharged when she was no longer permitted to perform the duties required by her job. (*Id.*, at 13.)

■ With respect to Intervenor's first argument, several circuit courts have indicated that an employee may suffer an adverse employment action where her employer knew about, but failed to take action to abate, retaliatory harassment inflicted by co-workers. *See, e.g., Marrero v. Goya of Puerto Rico*, 304 F.3d 7, 26 (1st Cir.2002)("Just as an employer will be liable for discrimination if it tolerates a racially or sexually hostile work environment, it will be liable for retaliation if it tolerates severe or pervasive harassment motivated by the Intervenor's protected conduct"); *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 446 (2d Cir.1999)("an employee could suffer a materially adverse change in the terms and conditions of her employment if her employer knew about but failed to take action to abate retaliatory harassment inflicted by co-workers"); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir.1998)(holding that an employer may be liable for retaliation based upon co-worker harassment if supervisory or management personnel either (1) orchestrate the harassment or (2) acquiesce in the harassment in such a manner as to condone and encourage such conduct); *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir.1996)("No one would question the retaliatory effect of many actions that put the complainant in a more unfriendly working environment ... Nothing indicates why a different form of retaliation—namely, retaliating against a complainant by permitting her fellow employees to punish her for invoking her rights under Title VII—does not fall under the statute").

In contrast, other circuits have held that co-worker harassment alone cannot constitute retaliation for Title VII purposes. *See, e.g., Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 692 (8th Cir.1997)(requiring "tangible change in duties or working conditions that constituted a material employment disadvantage"); *Munday v. Waste Management of North America*, 126 F.3d 239, 243 (4th Cir.1997)(holding that employer's instructions to co-workers to ignore or spy on an employee who engaged in protected activity do not constitute adverse employment action absent evidence that terms, conditions or benefits of employment were adversely affected); and *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.1997)(requiring employer action be in

2. It appears that Defendant is conceding that Intervenor engaged in protected activity. Regardless, the Court notes that the record contained evidence that Intervenor made formal complaints to Defendant's management regarding the sexually offensive and harassing comments she was subjected to by Mr. Crumbling, thereby satisfying the requirement that she in fact engaged in protected activity.

the nature of "an ultimate employment decision" such as those concerning "hiring, granting leave, discharging, promoting, and compensating").

▉▉▉ Neither Intervenor nor Defendant has cited to any binding authority holding whether or not an employee suffers an "adverse employment action" where the employee is subjected to retaliatory harassment after engaging in protected conduct, and where the employer's supervisors or managers were aware of the harassment. In *Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir.1997), the plaintiff claimed, inter alia, that after she filed an EEOC complaint she was subjected to restricted job duties, reassignment, oral reprimands, and forced to work with an alleged harasser who, after plaintiff rebuffed his advances, "sometimes would not talk to her, or would make unnecessary derogatory comments to her." 120 F.3d at 1300. The Third Circuit found that such treatment did not constitute retaliation under Title VII. *Id.* ("The alleged 'unsubstantiated oral reprimands' and 'unnecessary derogatory comments' suffered by [plaintiff] following her complaint do not rise to the level of what our cases have described as 'adverse employment action.' "). The Third Circuit explained:

> Retaliatory conduct other than discharge or refusal to rehire is thus proscribed by Title VII only if it alters the employee's "compensation, terms, conditions, or privileges of employment," deprives him or her of "employment opportunities," or "adversely affects [his or her] status as an employee." It follows that "not everything that makes an em-

ployee unhappy" qualifies as retaliation, for "otherwise, minor and even trivial employment actions that "an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." "

*Id.* Accordingly, in order to discern whether an employee has adequately demonstrated that he or she has been subjected to "adverse employment action" the Third Circuit found:

> Courts have operationalized the principle that retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment into the doctrinal requirement that the alleged retaliation constitute "adverse employment action." Accordingly, just as we concluded that a quid pro quo plaintiff must show a "quo" that is serious enough to alter his or her "compensation, terms, conditions, or privileges" of employment, we hold that the "adverse employment action" element of a retaliation plaintiff's prima facie case incorporates the same requirement that the retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e–2(a)(1) or (2).

*Id.* at 1300–1301.[3]

▉▉▉ Comparing the evidence taken in the instant case with that of *Robinson*, the Court finds that there was sufficient testimony from which a jury could have concluded that Defendant's management responded inadequately to the hostile environment complained of by Intervenor and that Intervenor was subjected to retaliatory harassment that substantially al-

---

**3.** 42 U.S.C. § 2000e–2(a) makes it an "unlawful employment practice"

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or such privileges of employment, because of such

individual's ... sex ... or to limit, segregate or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex[.]

tered her working conditions and her status as an employee. Evidence was presented from which a jury could have found that Intervenor was not merely subjected to silent treatment by Mr. Crumbling, but that the conditions of her employment were compromised in that her truck was no longer being loaded, her truck and its brake lines were being sabotaged, and she was subjected to a violent and hostile workplace atmosphere. Although *Robinson* clearly requires that an "adverse employment action" be serious and have a genuine adverse affect on an employee's employment status, the Court finds that the allegations and evidence demonstrating retaliatory harassment in the instant case were severe enough to constitute an "adverse employment action" under Title VII by altering significantly Intervenor's employment conditions and her ability to perform her job duties.

■ However, even if the harassing and dangerous atmosphere in which Intervenor worked following her complaints were found not to be "adverse employment action," Intervenor also presented evidence that she was effectively removed from her driving route and subjected to a different work assignment at a lower wage. Such a change in Intervenor's work responsibilities and wage constitutes an adverse employment action, and evidence was presented by which the jury could find that Intervenor had been subject to such an adverse action shortly after engaging in protected activity. Intervenor testified that shortly after she complained to management about Mr. Crumbling's and others' harassment of her in late January 2000, her driving route was put up for bid in May 2000. Shortly thereafter, Intervenor was no longer driving a truck for Defendant and was performing other duties for lower pay. Upon such evidence, the jury could have found that Intervenor had engaged in protected activity, had suf-

fered an adverse employment action shortly thereafter, and that the adverse action was causally related to the protected activity.

■ Defendant argues that Intervenor cannot demonstrate retaliation because the harassment Intervenor experienced after her complaints to management was identical to the harassment she experienced before she complained. In support of this proposition, Defendant relies exclusively upon *Waite v. Blair, Inc.*, 937 F.Supp. 460 (W.D.Pa.1995), aff'd 79 F.3d 1140 (3d Cir.1996) for the proposition that "retaliatory conduct must represent retaliation for engaging in protected activity ..., the retaliatory conduct cannot be both the cause of the ... complaints and their effect at the same time." *Id.* at 470. However, Defendant ignores Intervenors testimony that the subsequent harassment Intervenor endured was different in both form and degree from that suffered prior to her complaints. (Doc. No. 280, at 14.) For example, testimony was presented that following her complaints to management, Mr. Crumbling refused to assist her in loading her truck (thereby compromising her ability to perform her job functions), and that Intervenor was subjected to physical harassment on the job. Moreover, Intervenor testified that following her complaints, her vehicle and equipment were being sabotaged by employees. Because the record contains evidence upon which a jury could reasonably find that Intervenor was subject to retaliation following her complaints to management, the Court must deny Defendant's motion for judgment as a matter of law on this ground.

### iv. Intervenor Presented Sufficient Evidence to Establish Her IIED Claim

Defendant contends that Intervenor failed to establish a claim for IIED be-

cause (1) Intervenor failed to demonstrate that Defendant's conduct was extreme or outrageous and (2) such claim is barred by the Pennsylvania Workers' Compensation Act, 77 P.S. § 1 *et seq.* ("PWCA").

■ IIED is a state law tort, "the gravamen [of which] … is outrageous conduct on the part of the tortfeasor." *Clark v. Township of Falls*, 890 F.2d 611, 623 (3d Cir.1989)(quoting *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 190, 527 A.2d 988 (1987)). It is for the Court to determine initially whether a defendant's conduct is so extreme as to permit recovery. *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.1988). The Third Circuit has noted that Pennsylvania courts have been "chary to declare conduct 'outrageous' so as to permit recovery for intentional infliction of emotional distress and have allowed recovery 'only in limited circumstances where the conduct has been clearly outrageous.'" *Id.* (quoting *Krushinski v. Roadway Express*, 627 F.Supp. 934, 938 (M.D.Pa.1985)). Moreover, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Id.* (citation omitted). Thus, in a number of employment contexts, courts have been unwilling to find a basis for an IIED claim. *See, e.g., Clark*, 890 F.2d at 624 (forwarding charges about employee to district attorney, providing disparaging reports about employee to public, and depriving employment privileges were "deplorable" acts but did not constitute extreme and outrageous conduct under Pennsylvania law); *Cox*, 861 F.2d at 394–96 (firing an employee the day he returned to work following triple bypass surgery not outrageous); *Brieck v. Harbison–Walker Refractories*, 624 F.Supp. 363, 367 (W.D.Pa.1985)(dismissal alone insufficient to maintain IIED claim); *Madreperla v. Williard Co.*, 606 F.Supp. 874, 880 (E.D.Pa.1985)(premeditated plan to harass an employee into resigning not adequate for IIED claim); *Cautilli v. GAF Corp.*, 531 F.Supp. 71, 74 (E.D.Pa.1982)(tricking employee into foregoing other employment not outrageous).

■ Notwithstanding the difficulty of advancing a viable IIED claim in the employment context, the Third Circuit has noted that "the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee." *Cox*, 861 F.2d at 395. For example, the Third Circuit referenced *Bowersox v. P.H. Glatfelter Co.*, 677 F.Supp. 307, 311 (M.D.Pa.1988) in which:

> plaintiff alleged that her employer not only sexually harassed her but withheld information from her which she needed to perform her job, forbade her from talking to anyone in her office, prohibited her from answering the phone, refused to talk to her and followed her throughout the plant.

*Id.* at 396. In *Bowersox*, the district court noted "[t]hat a supervisor would subject his female employee to highly offensive speech and conduct in a close working environment and then, as a result of her negative reaction to that conduct, make the employee's job impossible to perform" could cause "an average member of the community" to find the conduct outrageous. 677 F.Supp. at 311.

■ Although it is clear that a plaintiff bears a heavy burden of demonstrating the requisite extreme and outrageous conduct needed to maintain an IIED claim, the Court concludes that Intervenor has met her burden in the case at bar. The jury was presented with evidence by which it could have found Intervenor was regularly subjected to rude and offensive language

and displays of physical vulgarity motivated by sex. Intervenor presented evidence that male co-workers spoke about having sex with her and advised her that women should remain barefoot and pregnant. After Intervenor complained to management about the sexual hostility she experienced in the work environment, evidence indicated that co-workers refused to load her truck, refused to speak with her, assaulted her with heavy freight, and sabotaged her truck. The jury heard testimony that would have supported a finding that Defendant's management responded inadequately to Intervenor's and others' reports of a sexually hostile work environment, effectively allowing the harassing conduct to continue and worsen. Intervenor plead for management intervention and her cries for help were ignored. Under the totality of the circumstances, the Court finds that Intervenor adduced evidence of conduct sufficiently extreme and outrageous to support liability on Intervenor's IIED claim.

▇ Defendant's additional arguments that it is entitled to judgment as a matter of law on Intervenor's IIED claim may be disposed of quickly. First, Defendant asserts that Intervenor's claims are barred by the PWCA, apparently because Intervenor was harassed in the workplace. The PWCA provides that:

> The liability of the employer under this act shall be exclusive and in place of any and all other liability to such employees . . . or to anyone else entitled to damages in any action at law. . . .

77 P.S. § 481 (2004). The PWCA defines injuries for which workers' compensation is the exclusive relief available to include "an injury to an employee . . . arising in the course of his employment and related thereto. . . ." 77 P.S. § 411(1). However, the PWCA contains the following exception to the rule:

> The term "injury arising in the course of employment" . . . shall not include an injury caused by an act of a third person intended to injure the employee because of reasons personal to him, and not directed against him as an employee or because of his employment; but shall include all other injuries sustained while the employee is actually engaged in the furtherance of the business or affairs of the employer[.]

*Id.* Pennsylvania courts and courts within this district have interpreted these provisions as excluding IIED claims arising from sexual harassment in the workplace from the preclusive effect of the PWCA. *Garvey v. Dickinson College,* 761 F.Supp. 1175, 1191 (M.D.Pa.1991); *Schweitzer v. Rockwell Int'l,* 402 Pa.Super. 34, 586 A.2d 383, 391 (1990). Accordingly, the Court finds that the PWCA does not operate to bar Intervenor's IIED claim based upon her allegations of sexual harassment.

Finally, Defendant argues that even if Intervenor did establish the fundamental requirements of an IIED claim, Defendant is not liable for the intentional or criminal acts of its employees. In support of this proposition, Defendant relies on cases holding that an employer will be held liable for the intentional or criminal acts of its employee only if the wrongful acts are committed within the scope of the employee's employment. Defendant's argument in this regard is unpersuasive and not supported by the evidence presented at trial. Defendant would appear to be likening this case to one where an employee or employees perpetrate criminal outlier acts so far outside the scope of their employment that they cannot be imputed to the employer. The evidence in this case suggested that Defendant was aware of the outrageous conduct and dangerous atmosphere polluting one of its facilities, and that it chose to ignore the problem, allowing the sexual harassment and retaliatory

conduct to exist and, indeed, to worsen. Moreover, Intervenor presented evidence suggesting that many of the actions (or inactions) taken with respect to Intervenor were perpetrated during working hours, in connection with daily responsibilities. The allegations and evidence suggested that the actions taken by Defendant's employees to create a hostile work environment and to retaliate against Intervenor were all work-related. Although the Court acknowledges the difficulty of presenting an IIED claim in the employment context, under the facts presented at trial, the Court finds that Intervenor presented sufficient evidence to sustain the jury's finding on the IIED claim.

For all of the foregoing reasons, Defendant's renewed motion for judgment as a matter of law (Doc. No. 257) will be denied.

**B. Defendant's Motion to Alter or Amend Judgment and Intervenor's Motion to Amend the Judgment Pursuant to Rule 60(a) of the Federal Rules of Civil Procedure (Doc. Nos. 249 and 303)**

In its motion to alter or amend judgment (Doc. No. 249), Defendant argues that judgment for Intervenor should be reduced by $1,160,000 in accordance with the statutory cap on damages mandated by 42 U.S.C. § 1981a. Intervenor opposes Defendant's request, asserting that the jury's verdict should be apportioned among Intervenor's various claims in order to honor the intention of the jury's verdict. Intervenor has also filed a motion to amend the judgment pursuant to Rule 60(a) of the Federal Rules of Civil Procedure. (Doc. No. 303.) Because both motions to amend the judgment concern the

same issues, the Court will consider the motions together.

42 U.S.C. § 1981a(a)(1) provides in relevant part that:

In an action brought by a complaining party under [Title VII] against a respondent who engaged in unlawful intentional discrimination ... prohibited under [Title VII] ... the complaining party may recover compensatory and punitive damages as allowed in subsection (b) ... from the respondent.

42 U.S.C. § 1981a(a)(1). The statute also contains the following applicable limitation on the recovery of such damages:

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—

(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

42 U.S.C. § 1981a(b)(3)(D).[4] Pursuant to these statutory provisions, Defendant contends that the jury verdict in the instant case must be reduced.

Intervenor's claims were grouped into employment discrimination claims and tort claims on the verdict form. The jury was properly instructed on each of Intervenor's claims, including the claim for sexual harassment under Title VII and the PHRA, and the Pennsylvania Constitution, (Doc. No. 304 and Exhibit thereto.), and on Intervenor's claim for intentional infliction of emotional distress. The special verdict form tendered to the jury contained only

---

**4.** Defendant acknowledges that it employs more than 500 employees. (Doc. No. 250, at 3.)

two separate counts, one labeled "Title VII" and the other denominated "Intentional Infliction of Emotional Distress."

 The jury found for Intervenor as to both categories of claims, finding discrimination on the basis of hostile work environment and tortious conduct. The jury awarded Intervenor the following damages for the claim denominated as "Title VII" on the special verdict form: (1) $101,400 for "back pay;" (2) $290,000 for "front pay;" (3) $210,000 in compensatory damages; and (4) $1.25 million in punitive damages. Defendant does not seek reduction of the jury's $391,400 award for "front pay" and "back pay," but argues that the remaining award of $1,460,000 for compensatory and punitive damages must be reduced to $300,000 in accordance with the limitations set forth in 42 U.S.C. § 1981a(b)(1)(D).

In response, Intervenor contends that the damages awarded by the jury should be allocated between the various claims in such a manner as to maximize the jury's award. Moreover, Intervenor asserts that the judgment should not be reduced by any amount because damages for claims under the Pennsylvania Constitution are not subject to any limitations.

 In *Gagliardo v. Connaught Laboratories, Inc.*, 311 F.3d 565 (3d Cir.2002), the Third Circuit held that 42 U.S.C. § 1981a "does not prevent a claimant from recovering greater damages under a state law claim that is virtually identical to a capped federal claim." *Id.* at 570. In that case, the plaintiff brought suit under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and under the PHRA. The Court noted that:

> the PHRA, with its similar language and applicability, clearly provides a cause of action nearly identical to that of the ADA. The fact that the PHRA does not

contain a damages cap further indicates that it was intended to provide a remedy beyond its federal counterpart, the ADA. As [other courts have] recognized, subjecting such state law claims to the federal cap would effectively limit a state's ability to provide for greater recovery than allowed under the corresponding federal law.

*Id.* at 570–71. Therefore, the Court concluded that:

> given the similarity of the claims and the jury's unapportioned award of damages, it is reasonable to infer that the jury intended to award its entire verdict to Gagliardo. Because there is no cap under the PHRA, it was entirely reasonable for the trial court to apportion the damages so as to allow Gagliardo to recover the entire jury award, as reduced by the district court.

*Id.* at 571.

 The instant case is analogous to *Gagliardo* with regard to the similarity between Intervenor's causes of action under Title VII and the PHRA. However, unlike *Gagliardo,* the special verdict form tendered to the jury in the instant case did not contain any reference to the PHRA or the Pennsylvania Constitution, instead labeling Intervenor's claims only under the headings of "Title VII" and "Intentional Infliction of Emotional Distress." Because the verdict form did not explicitly require a finding from the jury for Intervenor's PHRA and Pennsylvania Constitution claims, Defendant argues that to now allocate damages for such claims would be "tantamount to rewriting the jury's verdict." (Doc. No. 289, at 6.) Intervenor counters that equity dictates that the damages be apportioned among the claims in order to maximize the award "where applicable federal and state claims are symmetrical."[5] (Doc. No. 272.)

---

5. The Third Circuit has found that the analysis regarding claims brought under the PHRA

Notwithstanding the labels used on the special verdict form in this case, the jury was in fact instructed that Intervenor's claims of sexual harassment were predicated on the PHRA and the Pennsylvania Constitution, as well as Title VII. During the charging conference, Intervenor's counsel reminded Defendant's counsel and the Court as to Intervenor's PHRA and Pennsylvania Constitution claims, and Defendant offered no objection or comment. (Transcript of February 23, 2004 Charging Conference, at 40.) Indeed, Intervenor's state law claims were the subject of discussion among the parties and the Court in determining how to structure the special verdict form that ultimately was used. Intervenor's counsel advised the Court and Defendant that the instructions for the PHRA and Title VII claims were essentially identical. (*Id.*, at 41.) Again, Defendant's counsel did not object to this assertion. Subsequently, the Court advised the jury that Intervenor was suing Defendant for sexual harassment under Title VII, the PHRA and the Pennsylvania Constitution. Thereafter, the Court instructed the jury on the law of sexual harassment but, in accordance with the jury instructions tendered by the parties, the Court did not offer different instructions for Title VII, PHRA and Pennsylvania Constitution.[6]

Considering the jury charge as a whole and the facts in support of the jury's verdict, the Court concludes that implicit in the jury's verdict is a finding on each of Intervenor's Title VII, PHRA and constitutional claims. This is so because despite the factual complexities of this case that required nearly three weeks of trial testimony, the essential basis of Intervenor's claims under each of the statutes is the same. The jury was called upon to review the same evidence and to determine the truth of Intervenor's claim of sexual harassment and retaliation opposed to Defendant's denial of wrongdoing by its employees and managers. The jury believed Intervenor and signified that fact by marking the verdict form in Intervenor's favor on the "Title VII claim". In so doing, the jury must also have found in Intervenor's favor with respect to the constitutional claim and the PHRA claims to render a consistent verdict. That is, had the jury been afforded a place on the verdict slip to address the remaining claims individually, the verdict could only be for Intervenor as the same facts and same elements apply to each of the remaining claims. Any other verdict would be stricken as inconsistent with the jury's verdict on the Title VII claim. The jury was instructed that the Intervenor's suit was brought under each such law and then instructed about the law of sexual harassment generally, without regard to the particular statute or constitutional provision on which Intervenor based her claims. Thus, the inadvertent use of a verdict form that failed to specify each of Intervenor's bases for recovery cannot deprive Intervenor of the jury's intended award. Accordingly, the Court finds that the proper means of respecting the jury's intended verdict while at the same time complying with federal and state law regarding damage caps is to allocate $300,000 of the punitive damage

---

and Title VII is identical. *Goosby v. Johnson & Johnson Medical, Inc.,* 228 F.3d 313, 317 n. 3 (3d Cir.2000).

**6.** In its opposition to Intervenor's motion to amend the judgment, Defendant selectively cites to one instance during the jury charge regarding an instruction that in order to award punitive damages the jury needed to find that Defendant acted with malice or reckless indifference to Intervenor's "federally protected rights." (Doc. No. 313, at 6.) Defendant's selectivity in this regard ignores the totality of the instructions given and, in any event, does not necessarily lead to the conclusion that the punitive damage award was necessarily predicated exclusively on Intervenor's Title VII claim.

award to Intervenor's Title VII claim and allocate the $210,000 award for compensatory damages to Intervenor's PHRA claim.

Defendant opposes the allocation of any award amount to Intervenor's claim under the Equal Rights Amendment to the Pennsylvania Constitution, Pennsylvania Constitution, Art. 1, § 28 ("PERA"), on the grounds that there is no private right of action for sexual harassment. In support of its argument, Defendant cites to a number of decisions from courts within this circuit holding that the PERA does not provide for a private right of action for damages under the state constitution. *See, e.g., Ryan v. General Machine Prod.,* 277 F.Supp.2d 585, 595 (E.D.Pa.2003); *Douris v. Schweiker,* 229 F.Supp.2d 391, 405 (E.D.Pa.2002); *Dooley v. City of Philadelphia,* 153 F.Supp.2d 628, 663 (E.D.Pa. 2001). Indeed, this conclusion was reached recently in *EEOC v. Dan Lepore & Sons Co.,* 2004 WL 240315, 2004 U.S. Dist. LEXIS 1943 (E.D.Pa. Feb. 9, 2004), where the court denied an intervenor's request to assert a claim under the PERA because "the Pennsylvania Constitution does not create" a private cause of action for damages under the PERA. *Id.* at *5, 2004 U.S. Dist. LEXIS 1943 at *14. A contrary result was reached in *Imboden v. Chowns Communications,* 182 F.Supp.2d 453, 458 (E.D.Pa.2002) and in *Kemether v. Pennsylvania Interscholastic Athletic Ass'n,* 15 F.Supp.2d 740, 755 (E.D.Pa. 1998).

■ Although the Third Circuit has not yet directly addressed the issue, Intervenor cites *Pfeiffer v. Marion Center Area Sch. Dist.,* 917 F.2d 779 (3d Cir.1990) in support of her argument that the PERA allows a private right of action. There the Court addressed in dicta the private right of action under PERA: "We are of the view that a private right of action is available for cases of gender discrimination under the Pennsylvania ERA." *Id.* at 789

(citing *Bartholomew on Behalf of Bartholomew v. Foster,* 115 Pa.Cmwlth. 430, 541 A.2d 393 (Pa.Commw.1988), aff'd, 522 Pa. 489, 563 A.2d 1390 (1989); *Welsch v. Aetna Ins. Co.,* 343 Pa.Super. 169, 494 A.2d 409 (1985)).

This Court is likewise persuaded by state decisions on the issue that Pennsylvania law does permit a private action to enforce the rights guaranteed by the Pennsylvania Constitution. Accordingly, the Court finds that the remaining $950,000 of the punitive damages awarded is properly allocated to Intervenor's PERA claim.

## C. Intervenor's Motion to Amend the Judgment to Provide for Pre-Judgment Interest (Doc. No. 266)

Intervenor requests entry of an order pursuant to Rule 59(e) of the Federal Rules of Civil Procedure amending the judgment in this case to provide for post-judgment interest in the amount of $3,495. Defendant contends the amount of such interest should total no more than $1,277.64.

■ In the event of a verdict for a plaintiff, there is a strong presumption in favor of awarding prejudgment interest. *Booker v. Taylor Milk Co., Inc.,* 64 F.3d 860, 868 (3d Cir.1995). In this circuit, prejudgment interest is typically calculated using either of two methods: (1) Internal Revenue Service rates or (2) the rates used in 28 U.S.C. § 1961, the post-judgment statute. *O'Neill v. Sears, Roebuck & Co.,* 108 F.Supp.2d 443, 445 (E.D.Pa.2000)(citing cases applying each method). The parties agree that the prejudgment interest in this case should be calculated using the post-judgment interest rates set forth in 28 U.S.C. § 1961(a). However, the parties differ in their calculations of the amount of pre-judgment interest due in this case, apparently because

they utilize differing interest rates and differing periods over which pre-judgment interest accrued.

██ The Court concludes that Intervenor's calculation accurately reflects the amount of prejudgment interest due in this case. Intervenor calculated pre-judgment interest dating from September 2000 (the date her employment terminated) through February 24, 2004 (the date of the jury's verdict). Intervenor's financial consultant multiplied Intervenor's back pay award against prevailing one-year Treasury bill rates in effect in the years in which the back pay would have been earned over a period of 3.43 years, thereby compounding the interest yearly based upon the amount of earnings Intervenor would have collected in each successive year of employment, plus all preceding years. (*See* Doc. No. 293 and attached Verzilli supplemental report dated April 14, 2004.) In contrast, Defendant simply took the 1–year constant maturity Treasury yield for the week ended February 20, 2004 and multiplied the rate against the total back pay award. The Court finds that Intervenor's proposed calculation more accurately serves the purpose of making Intervenor whole for the back pay she would have received had she remained employed by Defendant. *See O'Neill v. Sears, Roebuck & Co.,* 108 F.Supp.2d 443, 445 (E.D.Pa.2000) (discussing proper method of calculating pre-judgment interest). Accordingly, Intervenor's motion for an award of pre-judgment interest in the amount of $3,495 will be granted.

**D. Intervenor's Motion to Amend the Judgment to Include an Award to Account for Negative Tax Consequences of a Lump Sum Payment of Back Pay and Front Pay (Doc. No. 264)**

██ Intervenor seeks entry of an order pursuant to Rule 59(e) of the Federal Rules of Civil Procedure amending the judgment in this case to include a "gross-up" of the verdict to account for alleged negative tax consequences that would attend the lump sum payment of back pay and front pay. Defendant objects to Intervenor's request, arguing that such a tax enhancement award would be speculative. Moreover, Defendant argues that amending judgments to account for enhanced tax liability is unsupported under the law.

No decision of the Third Circuit authorizes the amendment of a judgment to account for negative tax consequences that result from a lump sum award of front or back pay. Courts within the circuit are divided on the issue. *Compare O'Neill v. Sears, Roebuck & Co.,* 108 F.Supp.2d 443, 448 (E.D.Pa.2000)(finding award appropriate, and noting plaintiff supported her request with testimony from financial consultant) with *Anderson v. Consolidated Rail,* 2000 WL 1622863 at *4–5, 2000 U.S. Dist LEXIS 15978 at *14–15 (E.D.Pa. Oct. 26, 2000)(refusing to adjust award to account for tax consequences because such amendment would be speculative, noting plaintiff had not supported her request with any evidence) and *Shovlin v. Timemed Labeling Sys., Inc.,* 1997 WL 102523 at *3, 1997 U.S. Dist. LEXIS 2350 at *7 (E.D.Pa. Feb. 28, 1997)(same).

In support of her argument in favor of amending the judgment, Intervenor submitted two letters and sets of calculations from Verzilli & Verzilli & Consultants, Inc. ("Verzilli") (*See* exhibits attached to Doc. Nos. 265 and 294.) In the Verzilli letter dated April 14, 2004, Intervenor's financial consultants set forth a detailed calculation that estimated Intervenor's tax liability by taking into account (1) 2003 IRS tax tables, (2) Intervenor's and her husband's income tax returns, and (3) the aggregate back pay and front pay award of $391,400. The April 14, 2004 letter also indicates that

Verzilli considered Intervenor's husband's 2002 W–2 earnings and the 2002 Schedule A itemized deductions, and three personal exemptions in reaching its calculations. Under the Verzilli analysis, as a result of the lump sum payment from the judgment in this case, Intervenor and her husband would have gross earnings in 2004 of $422,938. After backing out itemized deductions ($9,024) and personal exemptions ($9,000), Intervenor's total taxable income was estimated to be $404,914. Based on this taxable income, Verzilli calculated Intervenor would owe $116,926 in taxes and would have an effective tax rate of 27.65%.

In contrast, in an allegedly normal year, Intervenor and her husband would have total gross earnings of $69,853 and total taxable income of $51,829. Intervenor would have owed an estimated $7,074 in taxes and would have an effective tax rate of $10.13%. Verzilli then multiplied the difference in the two effective tax rates (17.52%) against the $391,400 award to calculate a negative tax consequence of approximately $68,600.

The Court recognizes, on the one hand, that Intervenor will face a significant tax burden in the current year as the result of the judgment. However, amending the judgment to account for negative tax consequences attending the award for a lump sum payment of future earnings necessarily requires a significant degree of speculation. Intervenor has offered calculations from a financial specialist that attempt to quantify the negative tax consequences, thereby minimizing the speculative nature of the proposed adjustment. However, Intervenor offers insufficient support to justify the unusual and extraordinary form of relief she requests. The Court is aware of only one other court in this circuit that has found it appropriate to modify a jury's award to account for negative tax consequences on the basis of an economic expert's opinion and calculations. *O'Neill,*

108 F.Supp.2d at 448. In *Sears v. Atchison, Topeka & Santa Fe Ry.,* 749 F.2d 1451, 1456 (10th Cir.1984), the United States Court of Appeals for the Tenth Circuit affirmed an order amending judgment to account for negative tax consequences of receiving 17 years earnings in one lump sum. However, in doing so, the court noted that such awards may not be appropriate in a typical Title VII case. The Court agrees and concludes that enhancing the jury's award to account for alleged negative tax implications in this case would be too speculative and without adequate legal support. Accordingly, the Court will deny Intervenor's motion to amend the judgment to account for alleged negative tax consequences of receiving a lump sum payment of back pay and front pay.

### E. Intervenor's Motions for Attorneys' Fees and Costs (Doc. Nos. 260 and 271)

Intervenor submitted a petition and supporting brief for attorneys' fees on March 10, 2004. (Doc. No. 260.) Intervenor requests fees in the amount of $482,416, representing 1,868.40 hours of services rendered and expenses incurred in connection with the litigation, as well as $34,383.42 in legal expenses. Defendant filed an opposition to the petition on March 30, 2004 (Doc. No. 285), arguing that: (1) certain of the hours claimed are excessive, redundant or unnecessary; (2) the billing entries were insufficiently documented; (3) certain expenses claimed are not permitted by law or are unrelated to the prosecution of this case; and (4) the hourly rates requested by Intervenor's counsel are not reasonable. Subsequently, Intervenor supplemented the petition to revise downward her request for reimbursement of expert expenses. Defendant did not file any further responsive pleadings.

### 1. Standard for Attorneys' Fees

■ An award of attorneys' fees for the prevailing party in a Title VII action is provided by in 42 U.S.C. § 2000e–5(k).[7] The PHRA contains a similar fee-shifting provision at 43 Pa. Stat. § 962(c)(4)(c.2).[8] This Court finds that Intervenor was the prevailing party as demonstrated by the jury verdict in her favor. Therefore, the Court must determine reasonable attorneys' fees.

■ The accepted method of determining statutory attorneys' fees is the "lodestar" method. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir.1990). The lodestar amount is calculated by taking the amount of time reasonably expended by counsel for the prevailing party on the litigation and compensating that time as a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); *Brytus v. Spang & Co.*, 203 F.3d 238, 242 (3d Cir.2000). The lodestar presumably yields a reasonable fee. *Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1035 (3d Cir.1996).

■ The party seeking attorneys' fees bears the initial burden of proving that the requested fees are reasonable. *Rode*, 892 F.2d at 1183. To meet this burden, the fee petition must "submit evidence supporting the hours worked and the rates claimed." *Hensley*, 461 U.S. at 433, 103 S.Ct. 1933. The party opposing the fee award then has the burden to challenge the reasonableness of the requested fee, by affidavit or brief with sufficient specificity to give the fee

applicant notice of the objection. *Id.; Bell v. United Princeton Props., Inc.*, 884 F.2d 713 (3d Cir.1989). Once the adverse party raises objections to the fee request, the district court has considerable discretion to adjust the award in light of those objections. *Id.* at 721; *Rode*, 892 F.2d at 1183.

Defendant argues that Intervenor has failed to meet her burden of demonstrating that the requested fees are reasonable. Specifically, Defendant contends that (1) certain of the hours claimed are excessive, redundant or unnecessary; (2) the billing entries were insufficiently documented; (3) certain expenses claimed are not permitted by law or are unrelated to the prosecution of this case; and (4) the hourly rates requested by Intervenor's counsel are not reasonable. The Court will address Defendant's arguments below, beginning with a discussion regarding counsel's requested hourly rate of compensation.

### 2. Hourly Rate

■ A reasonable hourly rate is generally calculated according to the prevailing market rates in the community. *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *see also Student Pub. Interest Research Group v. AT & T Bell Labs.*, 842 F.2d 1436, 1448 (3d Cir.1988) (adopting the community market rule). The "starting point in determining a reasonable hourly rate is the attorneys' usual billing rate[.]" *Pub. Interest Research Group of N.J., Inc. v. Windall*, 51 F.3d 1179, 1185 (3d Cir.1995).

---

**7.** The statute provides: "In any action or proceeding under this subchapter, the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person." 42 U.S.C. § 2000e–5(k).

**8.** The statute provides: "If, after a trial held pursuant to subsection (c), the court of common·pleas finds that a defendant engaged in or is engaging in any unlawful discriminatory practice as defined in this act, the court may award attorney fees and costs to the prevailing plaintiff."

In support of the fee application, Attorney Sperling and Attorney Lamar each submitted affidavits regarding their stated current hourly rates of $350 and $275, respectively, and setting forth details regarding their skill and expertise in litigation similar to the instant case. In addition, Attorneys Sperling and Lamar have submitted affidavits from four attorneys practicing in either Philadelphia or the Harrisburg area in the field of employment law. Each affiant attested to the reasonableness of the fees requested and the challenges faced by practitioners representing plaintiffs in employment cases.

Defendant objects to the hourly rates claimed by Intervenor's counsel, and suggests that the Community Legal Services, Inc. ("CLS") survey of attorneys' fees in the Philadelphia area dictates lower rates than those sought in the fee application and are presumptively reasonable. *Maldonado v. Houstoun*, 256 F.3d 181, 187 (3d Cir.2001)(noting reasonableness of CLS fees). Although it may have been appropriate to focus exclusively on the prevailing market rates in the Harrisburg area, Defendant has suggested that reference to the CLS survey of rates charged in the Philadelphia area is appropriate. Accordingly, the Court will determine a reasonable hourly rate by considering the CLS survey, as well as the affidavits submitted in support of the fee application.

Attorney Sperling was admitted to practice in Pennsylvania in October 1979. Thus, when this case commenced in 2002, Attorney Sperling had approximately 22 years of experience. When the case concluded, Attorney Sperling had been practicing for more than 24 years. The CLS provides that the range of hourly rates for attorneys with between 21 and 25 years of experience is between $270 and $310 per hour.[9] The affidavits submitted in support of the fee application attest to Attorney Sperling's substantial expertise and success in the area of employment litigation, and support the reasonableness of Attorney Sperling's asserted billing rate. The affidavits also attest to the significant risks undertaken by counsel in representing litigants in sexual harassment cases on a contingency basis and indicate the difficulty litigants often face in engaging competent legal counsel in similar cases.

Considering the suggested CLS rates against Attorney Sperling's asserted rate and the affidavits filed in support of the fee application, the Court finds the asserted billing rate of $350 per hour to be reasonable and a fair rate for this litigation. Attorney Sperling demonstrated exceptional skill and expertise in employment law and is a seasoned trial practitioner uniquely qualified to advance Intervenor's factually and legally complex claims. Her representation of Intervenor in this action was undertaken on a contingency basis and subject to substantial risk, a factor not accounted for in the CLS rates offered by Defendant. Furthermore, Intervenor endeavored to obtain suitable counsel in the Harrisburg area and was unsuccessful, at least in part due to the challenges and difficulties presented by the litigation. For all of the foregoing reasons, the Court finds that Attorney Sperling is entitled to be compensated at a rate of $350 per hour for the services rendered in connection with this matter.

Attorney Lamar was admitted to practice in 1990 and, accordingly, had approximately 14 years of experience at the conclusion of this case.[10] The CLS provides

9. Defendant did not attach an exhibit setting forth the alleged CLS fees for the Philadelphia area. The fee schedule is provided at the CLS website, *www.clsphila.org*.

10. Attorney Lamar apparently began representing Intervenor in January 2003 and continued as Attorney Sperling's co-counsel through conclusion of trial in February 2004.

that attorneys with between 11 and 15 years of experience generally bill at a rate between $220 and $260 per hour. Based upon the suggested CLS rates, together with consideration of the affidavits filed in support of the fee application, the Court finds the requested billing rate of $275 to be a fair and representative rate for this type of litigation given Attorney Lamar's experience, the skill Mr. Lamar demonstrated during the course of this litigation, and the contingent nature of the representation.

### 3. Unreasonable, Excessive or Otherwise Unnecessary Fees

In addition to its specific arguments regarding discrete aspects of Intervenor's fee application, Defendant argues generally that Intervenor's requested fees are unreasonable because the EEOC actually commenced the litigation and Intervenor's counsel worked in concert with EEOC's attorney during much of the litigation. Moreover, Defendant contends that Intervenor has not provided Defendant with a copy of her written agreement with her attorneys and that this has prejudiced Defendant's ability to argue for a further reduction in the claimed fees. Finally, Defendant asserts that any fees recovered should be reduced because Intervenor failed to prevail on one of her four claims.

Defendant also offers the following objections relating to specific periods and amount of time incurred by Intervenor's counsel:

- four hours for fees incurred before representation of Intervenor commenced in October 2001;
- more than 75 hours spent before EEOC filed the complaint commencing this litigation;
- more than 13 hours of time which does not explicitly appear to be related to the litigation and for time incurred responding to the media;

- 9.2 hours for time spent opposing Defendant's motion to transfer venue;
- .87 hours for time spent placing unanswered telephone calls;
- more than 5 hours for clerical activities that allegedly could have been assigned to paralegals or associates;
- 130 hours for time spent responding to Defendant's two motions for summary judgment;
- 30 hours for the preparation and argument of seven motions in limine; and
- 40 hours spent during 125 conferences among Intervenor's counsel and EEOC "for which no subject of conversation" is included, suggesting to Defendant that the conversations indicate duplication of effort.

██ A district court should exclude hours from the lodestar calculation that are not reasonably expended. *Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. Hours are not reasonably expended if they are excessive, redundant, or otherwise unnecessary. *Id.* at 437, 103 S.Ct. 1933.

The Court does not agree with Defendant's unsupported argument that the hours spent in advance of this trial are not properly compensable. Attorney Sperling began her representation of Intervenor in March 2000 and was engaged in presenting Intervenor's case to the EEOC and preparing for and commencing this litigation. In *New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980), the Supreme Court noted that a court could properly award attorneys' fees for services rendered in connection with administrative proceedings to enforce Title VII. *Id.* at 66, 100 S.Ct. 2024. The Court finds that the legal services Attorney Sperling rendered in such administrative and pretrial proceedings were directly related to the instant case. Accordingly, the Court will not reduce the

fee award on the grounds that certain of Attorney Sperling's services were rendered in advance of the litigation in this Court.

The Court does agree, in part, with Defendant's assertion that Intervenor is not entitled to be reimbursed for attorneys' fees incurred in connection with public relations and dealing with the media, which accounted for 4.4 hours. (Doc. No. 285, Ex. B.) Defendant also objects to 8.6 hours of services which Defendant claims are not related to this litigation. However, despite the exacting scrutiny with which its counsel reviewed Intervenor's proposed attorneys' fees, Defendant failed to note that Intervenor's counsel rendered these remaining 8.6 hours of services free of charge. (Doc. No. 268, Ex. 1 at 4.) Accordingly, the objected-to charges for 8.6 hours were never billed, Defendant's objection to the uncharged fees is meritless, and no reduction is warranted.

■ The Court also agrees in part with Defendant that certain of Intervenor's requested fees related to clerical tasks not properly charged to Defendant. For example, certain such tasks include: (1) copying and faxing letters; (2) preparing and mailing deposition notices; (3) placing tabs on depositions; and (4) setting up telephone conferences. (Doc. No. 285, Ex. E.) Such clerical work is not properly billed at the rate of a senior attorney commanded by Attorney Sperling. *Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939, 942 (3d Cir.1995)(it is not appropriate to allow "the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals"); *Jordan v. CCH, Inc.*, 230 F.Supp.2d 603, 612 (E.D.Pa.2002)(excluding hours from fee petition that did not require attorney's legal knowledge and training). In

this case, Defendant has objected to five hours of Attorney Sperling's time. (Doc. No. 285, Ex. E.) The Court finds that four of these hours are clerical in nature, but finds the additional hour appears to be for preparing discovery requests, which the Court does not find to be clerical work. Accordingly, the Court will reduce the fee award by four hours of Attorney Sperling's time spent on clerical activities.

Finally, the Court is constrained to agree with Defendant that Intervenor's *de minimis* time spent placing unanswered telephone calls is not compensable. Accordingly, the Court will further reduce Attorney Sperling's fees by .87 hours, as requested by Defendant.

The Court does not agree with Defendant's further specific objections regarding the reasonableness of the time spent in representing Intervenor in this action. Defendant complains that Intervenor's counsel spent approximately 130 hours responding to two motions for summary judgment that were substantially similar in nature. Defendant argues that the motions for summary judgment did not present novel issues of law. Defendant presumes that the "majority of the time charged for responding to the motions presumably was spent on legal research, which would normally require the work of an associate, not a twenty-year lawyer[.]" (Doc. No. 285, at 8.). Moreover, in Defendant's judgment, "the final work products did not reflect 140 plus hours of work." [11] (Doc. No. 285, at 8–9.) Accordingly, Defendant proclaims that "the time and amount of fees attributable to these responses should ... be substantially reduced." (*Id.*, at 9).

---

11. Defendant complains that Intervenor's counsel spent approximately 90 hours responding to the first motion, and 40 hours responding to the second motion. The Court presumes Defendant simply miscalculated the total hours spent on these matters.

■ The Court agrees that it is generally inappropriate for an attorney to charge a rate demonstrating substantial experience, and at the same time incur an inordinately high number of hours researching issues with which the attorney presumably is familiar. *See Ursic v. Bethlehem Mines,* 719 F.2d 670, 677 (3d Cir.1983)("Routine tasks, if performed by senior partners in large firms, should not be billed at their usual rates"). However, as an initial matter, the Court does not agree with Defendant's unsupported presumption that the majority of counsel's time was spent on legal research. Indeed, a cursory review of counsel's time records relating to this work indicates that only a modest amount of time was spent on research alone. (*See* Doc. No. 285, Ex. F.)

More fundamentally, the Court notes that it was Defendant who elected to file two motions for summary judgment, to which Intervenor was required to respond. It is somewhat disingenuous to litigate aggressively and then complain that the opposing party fought vigorously to defeat motions adverse to its interests. In this case the stakes were high, the issues moderately complex, and the litigation contentious. The Court finds that counsel rendered necessary and valuable services in responding to and defeating Defendant's efforts to dispose of this litigation before trial. The Court further finds that the amount of time spent responding to Defendant's motions in this regard was reasonable.

Similarly, the Court finds that the 9.2 hours counsel spent contesting Defendant's motion to transfer venue was reasonable under the circumstances. Notwithstanding that EEOC did not contest the transfer motion, and notwithstanding Defendant's allegation that "Intervenor opposed the motion to transfer solely for the convenience of her counsel," the Court does not conclude that the time incurred was unreasonable. The fact that the litigation was transferred to this district caused Intervenor's counsel greater difficulty and expense, all of which was borne by Intervenor's counsel, who were engaged throughout this litigation on a contingency basis. It was not necessarily unreasonable for Intervenor to oppose transfer from the Eastern District of Pennsylvania, where the case had been pending for several months, in order to allow the litigation to be conducted more efficiently and cost effectively. Ironically, Defendant's success in transferring the case to this Court necessarily resulted in Intervenor's counsel incurring substantially higher costs, some or all of which will now be charged to Defendant. The Court finds that the time spent opposing the motion to transfer venue was reasonable and will not reduce the requested fees on this basis.

The Court also disagrees with Defendant that counsel's time spent preparing and advancing motions in limine should be reduced or excluded. Defendant argues that only one of Intervenor's motions in limine was actually granted, the time Intervenor's counsel spent on the motions was excessive, and Intervenor's counsel seeks fees for time spent refiling motions originally stricken for failure to comply with the local rules. However, the time entries Defendant focuses on do not support its arguments and, in several instances, flatly undercut Defendant's position. For example, Defendant complains about 12 hours of time described as follows: "Work on file; prepare for trial; work on abstracts from depositions." (Doc. No. 285, Ex. G.) It is not clear that any of these particular services related to Intervenor's motions in limine. Another entry *reads* 2 hours for: "Work on *Answer* to Motion in Limine." (*Id.*)(emphasis added) Rather than relating to Intervenor's own motions in limine, this time appears to have been spent objecting to Defendant's

motion in limine (*See* Doc. Nos. 64, 73.) Another large block of time is described as 8 hours for: "Answer and file Motions, Daubert and Motions in Limine." (Doc. No. 285, Ex. G.) Such services do not appear to concern exclusively unsuccessful motions in limine, but instead appear to relate to other pretrial activity as well. Excluding the foregoing entries, it would appear that Intervenor's counsel spent at least 8 hours relating exclusively or almost entirely to seven motions in limine.[12] The Court does not find that it was unreasonable for counsel to prepare and advance motions in limine in an effort to exclude potentially prejudicial evidence and to narrow the issues for trial, particularly in light of the complexity and contentiousness of the litigation in this case. That Intervenor had limited success on the motions does not persuade the Court that the time spent was unreasonable or excessive, and the fee award will not be reduced on this basis.

■ Finally, the Court does not agree with Defendant that it is necessary to reduce Intervenor's fee award on the basis of 125 conferences between and among Attorneys Sperling and Lamar, and counsel to the EEOC. Defendant complains that the conferences represent 40 hours of time expended on this case for which there is insufficient description. Defendant contends that the conversations "indicate duplication between the attorneys." Although the Court notes that it is important for a fee applicant to provide sufficient description regarding the services rendered, the Court does not find that counsel need be unflaggingly meticulous in describing the precise nature of each conference billed. The Third Circuit has instructed as follows:

On several occasions, this Court has considered the proper degree of specificity required of a party seeking attorneys' fees. In particular, we recently undertook such a review in *Rode v. Dellarciprete,* 892 F.2d 1177 (3d Cir.1990). We explained that specificity should only be required to the extent necessary for the district court "to determine if the hours claimed are unreasonable for the work performed." [citations omitted.] . . . Specifically, a fee petition should include "some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations, and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates." However, "it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney."

*Washington v. Philadelphia County Court of Common Pleas,* 89 F.3d 1031, 1037–38 (3d Cir.1996).

Applying this guidance to the fee application in this case, the Court does not conclude that the time entries about which Defendant complains are so devoid of detail as to be unreasonable. The time entries indicate communication, both written and oral, between and among counsel working together on a complex case. The Court also notes that many of complained-of entries relate to conferences that were brief in duration. The Court does not find it unreasonable for counsel to provide limited specificity regarding relatively brief, if frequent, communications relating to this case.

---

**12.** The Court recognizes that certain of the remaining complained-of entries also relate in part to motions in limine, but Defendant's argument that counsel's time was devoted exclusively to motions in limine is not supported by the entries highlighted on Defendant's exhibits. (Doc. No. 285, Ex. G.)

Defendant merely alleges, without any substantiation, that conferences among attorneys is tantamount to duplication. The Court does not agree. Although excessive conferences may in some instances be questionable, the Court finds that the regular conferences billed in this case were both reasonable and expected given the nature of the litigation. Additionally, the Court does not agree with Defendant that conferences inherently suggest duplication of effort among counsel. Furthermore, with respect to specificity and detail, each of the complained-of entries indicates the parties to the conference, who in all instances were counsel of record in this case. Accordingly, the Court finds that the complained-of entries listed in Exhibit H to Defendant's opposition (Doc. No. 285) were reasonable, and the Court will not reduce the requested attorneys' fees on this ground.

In sum, the Court will reduce the fee award by 9.27 hours of Attorney Sperling's time for the reasons discussed above.

### 4. Specificity

Defendant also objects that certain time entries lack specificity and should be reduced. "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley v. Eckerhart*, 461 U.S. at 433, 103 S.Ct. 1933. More specifically, "[a] fee petition is required to be specific enough to allow the district court to determine if the hours claimed are unreasonable for the work performed." *Keenan v. City of Philadelphia*, 983 F.2d 459, 463 (3d Cir.1992)(internal citations and quotations omitted).

The hours objected to by Defendant includes such entries as:

| Date | Task | Hours |
|------|------|-------|
| 2/23/01 | Tele. conf. w/witness | .83 |
| 4/2/02 | o/c | .10 |
| 6/6/03 | Review faxes | .10 |
| 12/1/03 | Review letter | .10 |
| 1/3/04 | EFC [sic] and Westlaw Research from January 3, 2004 through February 1, 2004 | 20.00 |

The Court agrees that such time entries lack specificity and, in many instances, lack any detail regarding the services rendered. None of the complained-of entries provide enough detail to suggest the services relate exclusively or even in part to the case at bar. The Court will, therefore, reduce the fee award accordingly by the 24.67 hours specified in Exhibit I to Defendant's opposition. (Doc. No. 285, Ex. I.)

### 5. Unspecified Communication With EEOC

Defendant also complains that 2.7 hours Intervenor's counsel have described only as various conferences with the EEOC should be disallowed. Defendant contends such entries are not compensable, as they lack specificity and may potentially be in reference to matters and cases unrelated to this litigation. Although the Court presumes that the entries relate to the case at bar, the Court agrees with Defendant that the time entries are too vague and generalized to permit recovery. Aside from one entry in which Intervenor's counsel references a certain "Yvonne" at the EEOC, the time entries do not reflect the identity of the party or parties with whom counsel was conferring. Although the Court does not find that counsel's records must be slavishly precise in order to be compensable, the Court finds that the entries listed in Exhibit K to Defendant's opposition are simply too general to permit recovery.

Accordingly, the fee award will be reduced by 2.7 hours of Attorney Sperling's time relating to general discussions with the EEOC.

### 6. General or Unrecoverable Charges

Defendant objects to Intervenor's request that she be reimbursed for $950 for "Westlaw research throughout the case" billed on March 9, 2004 because Intervenor's counsel does not identify the research conducted, the person who conducted the research, or the purpose of the research with respect to the issues in this case. Defendant also suggests that "the even amount of the charge suggests that it is estimated or apportioned," and apparently believes the charge should be disallowed on this ground as well. Subsequently, Intervenor produced itemized documentation regarding Westlaw and ECF charges. Accordingly, the Court will not reduce the fees and expenses awarded on this basis.

Defendant also objects to a submitted charge in the amount of $310.00 for "Compu-Weather weather report" billed on October 14, 2003. Intervenor's counsel subsequently advised the Court that this particular charge was incurred in order to obtain information regarding the weather in Middletown, Pennsylvania on the day Intervenor claimed her brake lines were slit. The Court therefore finds this expense relates to this case and was incurred reasonably.

In addition, Defendant relies on *West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83, 102, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) for the proposition that Intervenor may not recover expert fees incurred in this case because 42 U.S.C. § 1988 conveys no authority to shift expert fees. Defendant fails to acknowledge that Intervenor has moved for attorneys' fees

and costs not only under 42 U.S.C. § 1988, but also under 42 U.S.C. § 2000e *et seq.* and the PHRA. Indeed, 42 U.S.C. § 2000e–5(k) provides explicitly that expert fees are recoverable:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (*including expert fees*) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

42 U.S.C. § 2000e–5(k)(emphasis added). In addition, it appears that the limit on recovery of expert fees discussed in *Casey* has been effectively overruled by the Civil Rights Act of 1991. *Greenwood v. Stone*, 136 F.Supp.2d 368, 370 (W.D.Pa.1992). Accordingly, the Court finds Defendant's argument in this regard to be meritless and shall award Intervenor expert fees in the claimed amount of $18,634.02.[13]

Finally, Defendant objects that Intervenor should not be reimbursed for $182.73 in miscellaneous expenses for which there was insufficient description. (Doc. No. 285, Ex. L.) Defendant contends that entries reading as nothing more than "postage" and "phone calls" should not be reimbursed. Although the amount in question is negligible, the Court must disagree with Defendant. The Court does not find it reasonable to require in all instances that a fee petitioner include a heightened level of description regarding the most basic of overhead expenses incurred during the course of representation. The expenses challenged in this case are limited in amount and are the kinds of expenses ordinarily incurred during litigation. Accordingly, the Court will deny Defendant's objection in this regard.

13. Intervenor originally requested reimbursement of $21,971.02 in expert fees, but subsequently requested that this amount be revised downward by $3,337.00.

### 7. Lodestar Reduction

The lodestar is presumed to yield a reasonable fee; however, it may be reduced to account for "results obtained." *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. This reduction may be used to account for time spent litigating wholly or partially unsuccessful claims that are related to the litigation of successful claims. Rode, 892 F.2d at 1183. The party seeking the adjustment bears the burden of proving that an adjustment is necessary. *Id.* Moreover, the Supreme Court has instructed district courts to "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation. Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933.

Defendant argues that the lodestar should be reduced in this case because Intervenor prevailed on only three of her four claims, the jury having found for Defendant on Intervenor's claim of gender discrimination. However, the Supreme Court has instructed that where a "plaintiff has failed to prevail on a claim *that is distinct in all respects from his successful claims,* the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Hensley,* 461 U.S. at 440, 103 S.Ct. 1933 (emphasis added). In this case, Intervenor's actions and theories of recovery were substantially interrelated and can hardly be considered "distinct in all respects." *Id.* Therefore, the Court does not find it is necessary or appropriate to reduce the fee award in this case.

### 8. Costs

Intervenor seeks payment of costs in the amount of $7,794.70 as reflected in the bill of costs submitted by Intervenor on March 22, 2004. (Doc. No. 271.) Defendant objects to the following such costs:

- $430 for displaying videotaped deposition of Leonard Buckman;
- $823.53 for duplicate deposition transcripts;
- $478.59 for enlargements of exhibits greater than 8' × 10" used at trial instead of utilizing the Court's projector system;
- $550.75 for costs invoiced by G & S Process Serving Division for "Investigative Services" in connection with serving a witness, Branden Ehrhart, who ultimately never testified at trial; and
- Finance charges of $11.99 and $23.98 for late payment.

In response, Intervenor concedes that she should not be reimbursed for the $823.53 charge for duplication transcripts, and further agreed that Defendant should not be assessed finance charges in the aggregate amount of $35.97. However, Intervenor argues that the costs incurred for displaying the Buckman deposition were necessitated by Defendant's own late objections to certain testimony. Additionally, Intervenor requests permission to assess as taxable the charge for enlarging exhibits because the jury had difficulty viewing the exhibits over the Court's projection system. Finally, Intervenor contends that it is permissible to tax Defendant with the costs associated with serving a witness who ultimately failed to appear.

The Court finds that it is inappropriate to tax Defendant with the costs of enlarging exhibits for use at trial, as there were other means available of publishing such exhibits to the jury. Defendant need not bear the cost for all of Intervenor's tactical decisions regarding the manner in which to present evidence at trial. Similarly, the Court finds that Defendant should not bear the cost of serving a witness who never in fact testified at trial. However,

the Court does find it reasonable to assess Defendant with the cost of displaying the Buckman deposition, as it appears Defendant bears at minimum some responsibility for necessitating this expense.

Accordingly, after removing the excluded costs discussed above, the Court finds that Defendants shall pay $5,905.86 in litigation costs.

### 9. Calculation

To summarize, the attorneys' fees and expenses awarded to Intervenor in this case are calculated as follows:

| | 1114.96 Hours | Hours Claimed by Attorney Sperling |
|---|---|---|
| minus | 36.64 Hours | Reduction in Allowed Hours |
| | **1078.32 Hours** | **Total Compensable Attorney Sperling Hours** |

| | 1078.32 | Allowed Attorney Sperling Hours |
|---|---|---|
| times | $ 350.00 | Attorney Sperling's Allowed Hourly Rate |
| | **$377,412** | **Subtotal of Attorney Sperling's Allowed Fees** |

| | 324.0 | Hours Claimed by Attorney Lamar |
|---|---|---|
| times | $ 275.00 | Attorney Lamar's Allowed Hourly Rate |
| | **$ 89,100** | **Subtotal of Attorney Lamar's Allowed Fees** |

| | $ 377,412 | Subtotal of Attorney Sperling's Allowed Fees |
|---|---|---|
| plus | $ 89,100 | Subtotal of Attorney Lamar's Allowed Fees |
| | **$ 466,512** | **Total Allowed Attorneys' Fees** |

| | $ 29,637.17 | Allowed Expenses Incurred by Attorney Sperling |
|---|---|---|
| plus | $ 1,409.25 | Allowed Expenses Incurred by Attorney Lamar |
| | **$ 31,046.42** | **Total Allowed Expenses** |

| | $466,512.00 | Total Attorneys' Fees |
|---|---|---|
| plus | $ 31,046.42 | Total Allowed Expenses |
| | **$497,558.42** | **Total Fee Award** |

Accordingly, Intervenor is awarded $497,558.42 in attorneys' fees and expenses. In addition, Defendant shall be assessed litigation costs in the reduced amount of $5,905.86.

### G. *Order*

And now, this 18th day of January 2005, in consideration of the foregoing, **IT IS HEREBY ORDERED THAT:**

1. Defendant's Renewed Motion for Judgment as a Matter of Law (Doc. No. 257) is **DENIED.**

2. Defendant's Motion to Alter or Amend Judgment (Doc. No. 249) is **DENIED** and Intervenor's Motion to Amend the Judgment (Doc. No. 303) is **GRANTED.** The judgment will be amended to provide an award of $300,000 for punitive damages under Title VII and $210,000 for compensatory damages under the PHRA. The judgment will be further amended to provide that the remaining $950,000 in punitive damages awarded for Intervenor's hostile work environment claim shall be allowed and allocated to Intervenor's claims under the PERA. Intervenor's award of $101,400 for back pay and $290,000 for front pay are unaffected by this Order. In addition, Intervenor's award of $1,390,000 for compensatory and punitive damages relating to her IIED claim is unaffected by this Order.

3. Intervenor's Motion to Amend the Judgment to Include Pre–Judgment Interest (Doc. No. 266) is **GRANTED.** The judgment is hereby amended to provide Intervenor $3,495 in pre-judgment interest.

4. Intervenor's Motion to Amend the Judgment to Account for Negative Tax Consequences (Doc. No. 264) is **DENIED.**

5. Intervenor's Petition for Attorneys' Fees (Doc. No. 260) and Petition for Costs (Doc. No. 271) are **GRANTED** in part as follows:

 a. Defendant shall pay Intervenor $466,512 in attorneys' fees and $31,046.42 in expenses.

 b. Defendant shall pay Intervenor $5,905.86 in litigation costs.